IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 1, 2024

## STATE OF TENNESSEE v. RODERICK REDMOND

**Appeal from the Criminal Court for Shelby County**
**No. 21-01962      Paula Skahan, Judge**

———————————

### No. W2024-00359-CCA-R3-CD

———————————

The Defendant, Roderick Redmond, was convicted by a Shelby County Criminal Court jury of rape of a child, a Class A felony, and aggravated sexual battery, a Class B felony. *See* T.C.A. §§ 39-13-522 (Supp. 2020) (subsequently amended) (rape of a child), 39-13-504 (2018) (aggravated sexual battery). The trial court sentenced him to consecutive sentences of thirty years for rape of a child and ten years for aggravated sexual battery, for an effective forty-year sentence. On appeal, the Defendant contends that the evidence is insufficient to support his convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and MATTHEW J. WILSON, JJ., joined.

Phyllis Aluko, District Public Defender; and Harry E. Sayle III (on appeal) and Amy Mayne (at trial), Assistant District Public Defenders, for the appellant, Roderick Redmond.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Steve Mulroy, District Attorney General; and Dru Carpenter and Rob Steele, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to his sexual assaults of his then-ten-year-old stepdaughter.[1] The indictment charged the Defendant with rape of a child and aggravated sexual battery for offenses occurring between December 1, 2020, and April 6, 2021. The trial occurred in 2023.

———————————

[1] It is the policy of this court not to identify minors and victims of sexual assault.

At the trial, the thirteen-year-old victim testified that she was born in September 2010, that she was in the seventh grade, and that she lived with her mother and younger brother. She said that around Christmas 2020, she lived with her mother, brother, and the Defendant in an apartment, that her mother and the Defendant used the downstairs bedroom, and that she and her brother used the upstairs bedrooms. She said that at the time of the offenses, her mother worked at the Shelby County Sheriff's Department and that sometimes she and her brother were alone with the Defendant when her mother worked.

The victim testified that, initially, her relationship with the Defendant was "really good," that they did "things together," and that their relationship changed after Christmas 2020, when the first incident occurred. The victim said that she received a telephone call from her mother, who wanted the victim to tell the Defendant "something." The victim said that she ran downstairs to relay the message and that the Defendant was in the bathroom "coming out of the shower." The victim said that as she attempted to give the Defendant the message, the Defendant, who wore a towel, told her to "come here." The victim said that she complied, that the Defendant lowered the towel, that "he told [her] to stroke his private area," and that she complied with his instructions. She said that afterward, the Defendant told her to "keep it between us."

The victim testified that another incident occurred when the Defendant "call[ed] her downstairs to go in [her] mom's room," that she went in the bedroom, and that the Defendant told her to close the door. She said that the lights were off, that the Defendant was naked, and that he told her to undress and to get on the bed. She said that the Defendant lay flat on the bed, that she was on top of him, that her knees were near his face, and that her arms were near his legs. She said that they faced opposing directions, that the Defendant "licked her private area," and that he told her "to stroke his private area and also put it in [her] mouth." She said she did as he instructed. When asked how many times the Defendant "made" her do this, she said, "Not exactly, but at least, like, on the weekends. Like once a week." She said she did not tell her mother because of "the trust [the victim] just had in him." She said her brother was usually upstairs watching television or asleep when the incidents occurred.

The victim testified that on April 5, 2021, the Defendant told her to come downstairs to the living room and that he instructed her to "get down on [her] knees and lick his private area." She said that she "put his penis in [her] mouth," and that afterward, she went upstairs and sent a text message to her mother. A photograph of the text message was received as an exhibit, and it reflected that the victim sent a message to her mother stating, "Mommy[,] daddy made me suck his private part what do you want me to do?" The victim said that her mother called her on the telephone, that her mother asked if the victim was serious, that the victim confirmed what occurred, and that her mother ended the call and called the Defendant. The victim said that after her mother and the Defendant spoke on the telephone, the Defendant ran upstairs, yelled at her for telling her mother, ran downstairs, and left in

-2-

his car. She said that her godmother picked her up from the apartment and took her to her godmother's apartment, which was at the same complex, and that her mother and the police arrived. The victim said she underwent a medical examination by a nurse later the same day and a forensic interview at an unspecified time. She said she had been truthful during the forensic interview.

On cross-examination, the victim testified that the last incident occurred on April 5, 2021, that she thought she was out of school, and that the incident occurred shortly before noon. She said that her brother was upstairs in his room during the incident. She said that before the incident, she had been upstairs using her cell phone, that she went downstairs, and that she walked into the living room, where the Defendant was watching television. She said that the incident lasted "a few minutes, I guess." The victim did not recall telling the Defendant that she "hated" him before the incidents began.

Nurse Amanda Taylor, an expert in sexual assault examinations, performed the then-ten-year-old victim's physical examination on April 5, 2021, at 7:45 p.m. Ms. Taylor testified that the victim reported that the Defendant had been touching her for several months, that he had touched her breasts and genitals with his hands, that he had placed his mouth on her genitals, that he had placed his penis in her mouth, that he had not ejaculated, and that he had told her, "Don't tell anybody or I'll go to jail. And you don't want that[,] right?" Ms. Taylor said the victim reported that the incident on the day of the examination had occurred around 4:00 or 5:00 p.m. Ms. Taylor said the victim was tense, quiet, cooperative, soft-spoken, and answered questions. Ms. Taylor said the examination did not show injuries to the victim's genitals, which was consistent with the victim's report of the incidents. Ms. Taylor noted that the "majority of people" do not sustain injuries. Ms. Taylor stated that the victim reported urinating and eating candy after the incident, which could have impacted the presence of evidence.

The parties stipulated that the victim's oral and vulvar swabs analyzed by the Tennessee Bureau of Investigations did not "indicate the presence of male DNA."

Memphis Police Department Sergeant Euvonnie Keefer testified that she assisted with the investigation in this case. She said that the Defendant was interviewed on June 9, 2021, and a recording of the Defendant's statement was received as an exhibit and played for the jury.

In the statement, the then-thirty-year-old Defendant said that he and the victim's mother had been married since October 2020, and that they had been separated since the victim's April 2021 allegations. He stated that before the victim's accusations, there were no problems with his and the victim's relationship. He said, though, the victim had twice stated she hated him two years earlier. He said he had never gone inside the victim's bedroom late at night when everyone slept. He said the victim probably had walked in the

-3-

bedroom or bathroom when he was getting out of the shower and was not dressed. When asked if the victim had been in the living room when he slept on the couch, he said that he did not know and that he was a "hard sleeper."

The Defendant stated that he generally slept in the bedroom with the victim's mother, that he wore shorts when he slept, and that to his knowledge, the victim had not seen him naked. He said it was possible that the victim had seen him use the bathroom because he kept the bathroom door "cracked" due to the victim's four-year-old brother's entering the bathroom when he and the victim's mother used the bathroom. The Defendant said the victim had not seen him in a "state of arousal." He said that, to his knowledge, the victim had not touched his penis but that on one occasion, around mid- to late-March 2021, his penis was wet when he awoke on the living-room couch. He said that the wet substance was neither white nor sweat and that he had not experienced an orgasm. He said his penis was not erect when he awoke. He said that he did not masturbate before going to sleep, that he did not know what occurred, and that he did not investigate the matter. He said that he lay under a blanket but that his penis was "out" of his underwear. He said that on this occasion, he was home with the victim and her brother. When asked to explain what he thought the wet substance had been, he said saliva. He said that the victim's mother had previously attempted to wake him with oral sex after coming home late from work.

The Defendant stated that on one occasion, he awoke to the victim and her brother laughing in another room and that the victim "was grabbing and touching [her brother's] penis . . . and she put it in her mouth." He said that he did not know how to talk to the victim's mother about the incident. He said he was "shocked" and acknowledged he should have discussed the incident with the victim's mother. He said that the victim ran away from home before age ten, had been caught by her mother watching pornography, possessed video recordings on her cell phone of her cursing and discussing how her breasts had developed, and lied. He said that the incident in which he saw the victim put her brother's penis in her mouth occurred after the incident in which he awoke with a wet penis. The Defendant denied any wrongdoing.

The Defendant stated that the victim's brother mentioned the incident with the victim to his mother. The Defendant said that at the time of the incident, he walked away and called for the victim to come to him in the kitchen or living room area in order to stop the incident but acknowledged that he did not tell the victim's mother.

When the investigators told the Defendant about the specific allegations, he denied having licked the victim's private area. He said that he sometimes watched pornography at home at night while the victim's mother worked and the children slept.

-4-

The Defendant stated that on April 6, 2021, he worked until 1:00 p.m., that he called to see if "they" were okay, that he went to his cousin's home, that he arrived at his cousin's home at 2:30 p.m., and that he stayed twenty to thirty minutes. He said that he left and went home, that he spoke to the children, that he cooked chicken and fries for the children, that he received a telephone call from his mother around 3:00 p.m. while he cooked, and that he plated the food for the children and himself. He said that he ate while playing video games, that he went outside to smoke a cigarette after eating, that he resumed playing video games, and that he and the victim's brother roughhoused. The Defendant said that as it neared 4:00 p.m., he went to the store to purchase cigarettes, that he returned home, that he resumed playing video games, that the victim's cell phone rang, and that she ran upstairs. He said the victim's mother called at 5:00 p.m. and "asked what's going on and all this." He said that he was confused and that he told the victim's mother he did not know to what she referred. He said that he and the victim's mother had discussed the victim's mother's alleged infidelity earlier in the morning and that he asked during the afternoon phone call if she was referring to the alleged infidelity. He said that the victim's mother asked if he had seen the victim, that he told the victim's mother that the children were in the kitchen, that the victim's mother responded, "Okay," and that the victim's mother ended the call.

Referring to the incident in which the Defendant awoke with a wet penis, the investigator asked what the Defendant thought any forensic testing would have revealed. The Defendant responded that it probably would have shown the presence of the victim's DNA. The Defendant voluntarily submitted a DNA sample.

District Attorney General's Office Criminal Investigator Aaron Kant testified that he reviewed the victim's cell phone, which contained an approximate one-minute video recording, which reflected the victim, who stated she was age ten, talking about the development and size of her breasts. The video recording was received as an exhibit and played for the jury.

The victim's mother, who was employed as a Shelby County Sheriff's Department Deputy, testified that she grew up with the Defendant, that they began a romantic relationship in adulthood, and that he moved into her apartment with her children in 2017. She said that they married in October 2020, that she began working overtime at the sheriff's department before December 2020, and that the Defendant cared for the children when she worked. The victim's mother said that before December 2020, the victim and the Defendant had a father-daughter relationship and that there were "no issues." The victim's mother said the victim referred to the Defendant as "Daddy."

The victim's mother testified that between December 2020, and April 2021, the victim became "distant," less "open and talkative . . . like she normally was," and acted as though "she wanted just to be away." The victim's mother recalled that she saw the victim watching a video recording of "two women kissing or something," that she told the victim

-5-

the recording was inappropriate, and that she took away the victim's cell phone. The victim's mother said that the victim did not wear tight clothes and that the Defendant never raised concerns about the victim's clothes. The victim's mother said that the victim frequently made "silly videos" on the victim's phone and that she knew about the video recording of the victim's talking about her developing breasts. The victim's mother noted that the victim had entered puberty and had experienced menstruation. The victim's mother said that the recording was created before the victim's mother began working overtime at the sheriff's department.

The victim's mother testified that she spoke to her children about "good touches and bad touches" and that the Defendant never raised any concerns about the victim's "behaving inappropriately" toward the victim's brother. The victim's mother said, though, the victim ran away from home at age eight because of "grades and homework." The victim's mother said the Defendant never mentioned waking with a "wet" penis when the children were the only other people inside the home. She denied that she engaged in oral sex with the Defendant while he slept. She said the Defendant "was a regular sleeper unless he had been under the influence."

The victim's mother testified that she learned of the incidents when the victim sent her a text message, which the victim's mother showed to her supervisor. The victim's mother said that her supervisor began "making the necessary calls" and that the victim's mother called the victim to confirm the accuracy of the message. The victim's mother said the victim underwent a physical examination and a forensic interview.

The victim's mother testified that she called the Defendant after she arranged for the victim's godmother to pick up the children. The victim's mother said that her conversation with the Defendant "was a whole bunch of runaround," that she asked him "what was going on," that the Defendant said he did not know what she was talking about, and that she ended the call because he was not going to tell her anything.

On cross-examination, the victim's mother testified that the victim lost her cell phone privileges for weeks after the video recording of the women kissing, which was around the time the victim's mother began working overtime. The victim's mother said that afterward, parental controls were installed on the victim's phone and iPad. She said the victim only ran away from home for a few minutes to an hour. She said the victim did not "start lying" around Christmas 2020.

Teresa Onry, forensic interviewer with the Child Advocacy Center, testified that on June 4, 2021, she interviewed the victim about the allegations of sexual abuse. A recording of the interview was received as an exhibit and played for the jury.

In the interview, the victim stated that she lived with her mother and brother. She said that the Defendant, whom she said was her stepfather, "touched" her, that he asked her to "do weird things," and that he did weird things to her. She said the touching began after Christmas 2020. She said that one incident occurred when the Defendant got out of the shower. She said that he was wrapped in a towel and that he told her to come to the downstairs bathroom. She said the Defendant told her "to stroke" his "private part." She said her brother was asleep or upstairs at this time. She said that during the incident, the Defendant's private area "stood up" and that she did not "see or feel anything" come from his private area. She said that the Defendant asked her to do "something," but her explanation of what was asked of her is inaudible in the recording. She said that she declined, that the Defendant "pushed [her] away" and dressed, and that she returned to the living room.

The victim stated that the Defendant had been her stepfather for one-and-one-half years. She said that during another incident, the Defendant called her into "the room," that the Defendant was naked, that the Defendant asked her to undress and to lay on the Defendant, and that the Defendant told her to place his private area in her mouth. She said that she complied and that his private area stood up. She said nothing came from his private area.

The victim stated that during the last incident, as she prepared to bathe, the Defendant came to her bedroom and asked her to place his private area in her mouth.

The victim stated that she only remembered three incidents. She said that during two of those incidents, the Defendant "licked" her private area. She said this occurred once in her bedroom and once in her mother's bedroom. When asked to describe the incidents, she said that the Defendant lay on the bed and that her private area was "on top of his face." She said the Defendant's private area only entered her mouth. She said the last incident occurred shortly before she told her mother. She said that her mother was at work, that she sent a text message to her mother informing her of what occurred, that her mother called her to ensure the victim's message was correct, and that her mother called her godmother, who picked her up from their apartment.

The victim stated that the Defendant was kind to her and that they did things together before the incidents began. She said that she did not tell anyone about the incidents before she told her mother. She said that other sexual incidents occurred "on the weekends" when her mother worked.

After the election of the offenses, the jury convicted the Defendant of rape of a child and aggravated sexual battery. *See State v. Qualls*, 482 S.W.3d 1, 9 (Tenn. 2016) ("The election doctrine refers to the prosecutor's duty in a case where evidence of multiple separate incidents is introduced to elect for each count charged the specific incident on

which the jury should deliberate to determine the defendant's guilt."). The trial court imposed an effective forty-year sentence. This appeal followed.

The Defendant contends that the evidence is insufficient to support his convictions. He argues that the evidence cannot sustain his convictions because the "only evidence purporting to prove the essential elements" of the offenses came solely from the victim's testimony. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522. Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, *however slight*, of any part of a person's body . . . into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" *Id*. § 39-13-501(7) (2018) (emphasis added).

Aggravated sexual battery is defined, in relevant part, as "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [when] the victim is less than thirteen (13) years of age." *Id*. § 39-13-504(a)(4) (2018). Sexual contact, in relevant part, is "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" *Id*. § 39-13-501(6) (2018). "'Intimate parts' includes semen, vaginal fluid,

-8-

the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" *Id*. at (2).

In the light most favorable to the State, the evidence reflects that the victim testified in connection with the rape of a child conviction that the Defendant instructed the victim, who was age ten, to come into her mother and the Defendant's bedroom. When she entered the bedroom, the Defendant told her to close the door, undress, and lay on the bed. She recalled that the lights were off. The Defendant, who was naked, lay flat on the bed. The victim was on top of the Defendant, with her knees near his face and her arms near his legs. While they faced opposing directions, the Defendant "licked" her vagina and told her to "stroke" and put his penis in her mouth. The victim complied with the Defendant's instructions. During her forensic interview, the victim provided consistent statements with her trial testimony about this incident and further stated that the Defendant's penis "stood up."

In connection with the aggravated sexual battery conviction, the victim testified that sometime after Christmas 2020, the Defendant called her into the downstairs bathroom after the Defendant had showered. The Defendant wore only a towel and told the then ten-year-old victim to "come here." The victim complied with the Defendant's directions. The Defendant lowered the towel and instructed the victim to "stroke" his penis, and the victim followed the Defendant's instructions. Afterward, the Defendant told the victim to "keep it between us." During her forensic interview, the victim provided consistent statements with her trial testimony about this incident and further stated that the Defendant's penis "stood up."

We conclude that the evidence is sufficient to support the Defendant's rape of a child and aggravated sexual battery convictions. Although the Defendant argues that the victim's testimony was not corroborated, "it has long been the rule in our state that the uncorroborated testimony of a minor victim may be sufficient to sustain a conviction for forcible or coercive sex offenses . . . ." *State v. Collier*, 411 S.W.3d 886, 899 (Tenn. 2013); *see State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) ("[I]t is well-settled law in Tennessee that the testimony of a victim, by itself, is sufficient to support a conviction."); *State v. Robert Antwan McElmurry*, No. W2018-00360-CCA-R3-CD, 2019 WL 994178, at *4 (Tenn. Crim. App. Feb. 28, 2019), *perm. app. denied* (Tenn. June 24, 2019). The jury evaluated the evidence, credited the victim's testimony, discredited the Defendant's statement, and resolved any conflicts in the evidence in favor of the State. *See Bland*, 958 S.W.2d at 659; *see also Sheffield*, 676 S.W.2d at 547. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE